[Civ. No. 20802. Second Dist., Div. One. Aug. 15, 1955.]

MANUEL PUIM, Appellant, v. MARTIN E. CALLAHAN
et al., Respondents.

William Katz for Appellant.

Bailey & Poe and Rufus Bailey for Respondents.

WHITE, P. J.—Plaintiff is an inventor of three patented devices known as: (1) the Puim fork lift vehicle, referred to in the testimony and hereinafter in this appeal as the "universal loader." It is a hoister type of vehicle. A more minute description is unnecessary for the purposes of this appeal;

(2) the buck-rake loader attachment for tractors, being a fork-lift device designed for attachment to tractors and referred to in the testimony at the trial as a Puim fork-lift or universal fork-lift attachment, and hereinafter referred to as the fork-lift attachment;

(3) the hold-down clamp which is a two-pronged steel device that is attached to the top of the fork-lift part of the universal loader, or to the top of the fork-lift attachment, and which may be moved down upon the load picked up by the fork-lift attachment to clamp or hold the load in place. It will hereinafter be referred to as the hold-down clamp. Defendants assert that only one of the devices was patented and that upon the other three, letters patent have not been issued by the Patent Office. ▪ However, as pointed out by plaintiff, since defendants "are standing upon and affirming the license agreement, they may not be heard to question the title of the licensor under whom they claim."

Defendant Callahan Engineering Company is a partnership comprised of the individual defendant Martin E. Callahan and Juanita S. Callahan.

On July 19, 1951, plaintiff and defendants entered into an agreement whereby defendants were granted an exclusive license to manufacture and sell the aforementioned three devices in consideration of the payments by defendants to plaintiff of 4 per cent of the net sales thereof in the month following date of delivery.

The license agreement was to remain in force so long as defendants continued to manufacture and sell said devices, barring conditions beyond the control of licensee and acts of God, and if licensee ceased the manufacture of the licensed

items for a period of 90 days, licensor had the option to cancel said license.

The initial meeting between plaintiff and defendant Martin E. Callahan took place at San Jose, California, on July 14, 1951. At that time a pencil memorandum of the aforesaid license agreement was prepared. During the negotiations for the license agreement, plaintiff told defendant Martin E. Callahan that he, plaintiff, desired a provision in the contract that if defendants didn't manufacture or sell all of the licensed items for a stipulated time, to wit: 90 days, the license agreement would automatically be void, or that he could cancel the license agreement. Defendants agreed to manufacture and sell all of the items, and if defendants failed so to do for a period of 90 days, the plaintiff would have the right to cancel the license agreement. Plaintiff and defendants made a "package deal" and plaintiff had the right to cancel the license agreement if defendants did not manufacture for a period of 90 days all three devices covered by the license agreement.

At the conclusion of the negotiations for the license agreement, defendant Martin E. Callahan asked plaintiff to come to Los Angeles from San Jose for about four or five weeks to help defendants get started on the manufacture of the devices. Plaintiff thereupon informed defendants that he was interested in working for defendants if the compensation was satisfactory, and defendants asked plaintiff how much he wanted. Plaintiff stated that he wanted $125 per week. Defendants countered with an offer to pay him $100 per week, which plaintiff accepted. Plaintiff requested an advance from defendants to enable him to defray his expenses to go to Los Angeles from San Jose, and defendants advanced him $100. Plaintiff, pursuant to such arrangement, came to Los Angeles within a few days, arriving here about, but prior to July 19, 1951.

Defendants commenced to manufacture the fork-lift attachment and hold-down clamps within one to three weeks after plaintiff came to Los Angeles. Two sample or pilot models of the fork-lift attachment and a pilot sample or model of the hold-down clamp were made first by the defendants to take the "bugs" out and to be certain such devices were in good working order before making production runs thereof.

The universal loader is the largest of the items covered by the license agreement, and from the date of the execution of the agreement to and including July 8, 1953, the de-

fendants never manufactured a universal loader or a sample or pilot model thereof. The defendants asserted a variety of reasons for their failure to manufacture the universal loader or a sample or pilot model thereof. While defendants asserted they could not manufacture the universal loader because the plans thereof were incomplete or inadequate, and that they required plaintiff's services to prepare plans and drawings nevertheless, it is contended that defendants proceeded to manufacture the hold-down clamp and fork-lift attachment without drawings. Plaintiff also offered testimony that defendants could have completed a universal loader by the end of the year 1952, that after defendants, on July 8, 1953, received the notice of termination and cancellation of the license agreement from plaintiff, the latter was employed by another machine works and prepared from memory a complete set of plans and completed construction of the universal loader in less than six months.

Plaintiff worked for defendants from July 19, 1951, to July 8, 1953. No conversation concerning plaintiff's working for defendants was had during the two-year period of his employment other than that heretofore mentioned, which occurred at the time of the execution of the license agreement, wherein plaintiff agreed to come from San Jose to Los Angeles for four or five weeks upon payment to him of $100 per week, but no arrangement was made regarding plaintiff's compensation if he remained longer than originally contemplated. However, during the aforesaid two-year period, plaintiff received each week the sum of $100.

Defendants contended at the trial that the foregoing weekly checks were advanced against royalties and not paid as salary. Under the license agreement plaintiff was entitled to a royalty of 4 per cent on the net sales and was not required to work for defendants as a prerequisite to receiving such royalties. Defendants contended that the payments of $100 per week made to plaintiff as an advance against royalties was a device adopted for income tax reasons. In addition to plaintiff there were approximately six other persons working for defendants, to whom weekly checks were issued and for whom no deductions were made for withholding taxes, old age benefits, social security, etc.

Concurrently with the service by plaintiff upon defendants of the notice terminating the license agreement, plaintiff did not report for work and the record reflects that the $100 weekly payments were stopped at that time.

In his notice to defendants terminating the license agreement plaintiff demanded an accounting.. When no accounting was rendered this action ensued.

The court found that it was not true that plaintiff was employed by defendants as a mechanical technician from July 19, 1951, to July 3, 1953, at a salary of $100 per week. "That it is not true that the defendants never, from the date of said licensing agreement, to wit, on or about July 16, 1951, to on or about July 8, 1953, commenced to manufacture or sell the Universal Loader or the hydraulic hold-down clamp, and for more than 90 days prior to July 8, 1953 had ceased to manufacture the fork lift." It was further found, "That during the period from the 16th day of July, 1951, to and including the 1st day of January, 1954, defendants manufactured and sold in excess of sixty-three (63) of the fork-lift attachments and hold-down clamps described in said licensing agreement, and that the royalties due to plaintiff under the terms of said licensing agreement during said period amounted to $3,609.27, all of which said sum has been credited to the advanced royalty account of plaintiff and was fully accounted for by defendants to plaintiff."

"That it is true that defendants advanced and paid to plaintiff the sum of $10,186.49 as prepaid royalties to be earned under the terms of said licensing agreement, which said advances were made between the 16th day of July, 1951, and the 8th day of July, 1953; that during said period said advances to plaintiff by the defendant were charged to plaintiff's account, and that the royalties earned under the terms of said licensing agreement were credited to said account; that as of the 1st day of January, 1954, the royalties earned under the terms of said licensing agreement amounted to $3,609.27, leaving a debit balance of $6,577.22, and in this regard the Court finds that it was the intention of the parties to look only to royalties earned under the terms of said licensing agreement for repayment of said advances of $10,186.49." The court further found, "That it is true that the defendants did commence to manufacture or sell the units described in said licensing agreement on or about the 16th day of July, 1951, and have ever since said date continued the manufacture or sale thereof, and have not ceased to manufacture or sell said units for a period of ninety (90) days, and that said licensing agreement and arrangement for the manufacture and sale of said units dated the 19th

day of July, 1951, a copy of which is attached to plaintiff's complaint as Exhibit A, has not been breached by any act of the defendants and that plaintiff knew of the manner in which defendants were proceeding in the manufacture and sale of said units and acquiesced therein.''

From the foregoing findings the court entered the following conclusions of law: ''1. That the licensing agreement between the parties dated the 19th day of July, 1951, a copy of which is attached to plaintiff's complaint, marked Exhibit A, is in full force and effect, and has not been breached by the defendants.

''2. That defendants have accounted to plaintiff for all moneys due under said licensing agreement, and have paid to plaintiff the sum of $10,186.49, and have credited against such advanced royalties the sum of $3,609.27, as of the 1st day of January, 1954, leaving a balance of $6,577.22 which should be recovered only from future royalties due plaintiff under the terms of said licensing agreement as, if, and when received.

''3. That defendants are not entitled to a personal judgment against plaintiff under the counter claim set forth in defendants' answer.

''4. That defendants are not indebted to plaintiff for salary in any amount as set forth in plaintiff's complaint.'' Judgment was accordingly entered and plaintiff prosecutes this appeal therefrom.

As his first ground for reversal of the judgment herein appellant urges that, ''The trial court erred in entering a final judgment in violation of the stipulations under and pursuant to which the action was tried, and contrary to, and in violation of the basic rules of law governing the trial of and judgments in actions for an accounting.''

It is appellant's contention that the case was tried in part only; that there was an understanding and agreement between court and counsel that the issues respecting the validity of plaintiff's termination of the license agreement, his employment by defendants, and his right to an accounting for royalties under the license agreement and compensation under any employment agreement be determined first, and if it were found that an accounting was necessary, the court would then better be enabled to determine whether the matter of an accounting should be referred to a referee or special master, or whether the court should itself hear and determine such account. That it was understood between court and

counsel that an interlocutory judgment only would be entered, and a final judgment would await a hearing and determination of the accounting, if one was found necessary.

While it is elementary that findings of fact or a judgment entered in direct violation of a stipulation under and pursuant to which an action is tried is error, the record herein does not sustain appellant in his claim that there was an understanding, stipulation or ruling by the court as to the manner in which the evidence was to be presented. Examination of the record reveals that at the outset of the trial the following occurred:

"Mr. Katz (Attorney for appellant): I think we will go into the matters first of the licensing agreements, and if it then appears there is any accounting, I think maybe your Honor will refer it to a referee or perhaps by that time, if there is an indication that an accounting will be necessary, perhaps that accounting can be kept between ourselves.

"The Court: You may proceed as you deem best, Mr. Katz. At this time, of course, I can make no indication.

"Mr. Katz: Yes, thank you, your Honor."

Later in the trial the following reference to the subject of an accounting occurred:

"Mr. Katz: If your Honor please, at this time other than the matters that have to do with the accounting of a number of items manufactured and the prices received by the Callahan Engineering Company and the calculations involved, I have nothing further than those matters. I am going to, and I indicated to the Court and counsel too, it is my feeling that the matter of the accounting should await the presentation of the other evidence that goes to the merits of the matter, *and if an accounting is needed we can work it out some other way* not to take the time of this Court to go into that.

"Mr. Bailey: Yes, that is agreeable to us." (Emphasis added.)

The final word as to reference for an accounting occurred later in the trial when appellant's counsel stated:

"Mr. Katz: If your Honor please, that is our case as heretofore indicated, and we rest subject to proceeding with an accounting *if this Court finds it should be done.*" (Emphasis added.)

Assuming, but not deciding, that the foregoing might be construed as a motion for a reference, the granting or refusal of such a motion is addressed to the sound discretion of the court, and the ruling thereon will not be disturbed on ap-

peal unless there is a showing of abuse of discretion (*Reed* v. *Reed*, 118 Cal.App.2d 399, 400 [257 P.2d 1002]). References are ordered merely as an aid and assistance to the court. In a case where the court can get along well enough without it, a reference may be dispensed with. Where the transaction under consideration is not complex, the court itself may make the accounting after an examination of the testimony (*Berkowitz* v. *Kiener Co.*, 37 Cal.App.2d 419, 426 [99 P.2d 578]).

The reporter's transcript in the case now engaging our attention embraces some 950 pages, and from an examination thereof we are satisfied that the case was fully tried from an accounting standpoint. The conduct of respondents' business was fully inquired into. Its internal affairs were examined, as were the income tax reports of the business and the individual partners therein. The testimony of respondent Martin E. Callahan and of the accountant Ralph D. Stolrow furnished substantial evidence upon which the court could arrive at an accounting between the parties. The learned trial judge was ready at all times to receive any evidence to support appellant's claims. No abuse of discretion appears in the conclusion arrived at by the trial judge from an examination of the record, that questions fit for a refereee could be determined by him, thus saving time and expense, and that no useful purpose would be served by a referee.

Appellant earnestly assails the findings of fact as unsupported by the evidence. He complains that the finding that respondents "manufactured and sold in excess of sixty-three (63) of the fork-lift attachments and hold-down clamps described in the licensing agreement" is insufficient. That appellant is entitled to know the exact number of such appliances manufactured and sold as well as the price at which they were sold. However, the court did find that the royalties due appellant under the terms of the license agreement amounted to $3,609.27. When it is remembered that under the license agreement appellant was entitled to 4 per cent of the net sales it is manifest that appellant was not prejudiced because no claim is made that the mathematical computation of the amount due him does not represent 4 per cent of the more than 63 machines found to have been sold. The exact number was reflected in the proof obtained from respondents' books and records during the trial and was therefore known to appellant.

 With reference to the finding that appellant's contention that respondents never, from the date of the license

agreement, commenced to manufacture or sell the universal loader was untrue, such finding was justified on substantial evidence that there were government restrictions on the purchase of the axles required by these larger devices and that it was impossible to purchase them during the early part of the agreement without a defense order from the federal government; that the drawings furnished by appellant were not set out in sufficient detail, and that appellant acquiesced in the delay in manufacturing said item.

The finding that the money paid by respondents to appellant constituted royalties and not wages is supported by substantial evidence including appellant's own admission that in his income tax returns he treated this money as advances on royalties, and also by testimony that appellant in his divorce trial, testified that he owed respondents the balance shown on an exhibit introduced into evidence and which reflected royalties. We have examined the other findings complained of by appellant but a reading of the record convinces us that we are without authority to disturb them under the familiar rule that the power of an appellate tribunal in reviewing a challenge to the sufficiency of the evidence to support the conclusions of the trier of facts is limited to a determination as to whether the record contains substantial evidence, contradicted or uncontradicted, to support such findings and conclusions.

The judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied August 30, 1955, and appellant's petition for a hearing by the Supreme Court was denied October 13, 1955.